**Opinion issued June 28, 2012**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-09-01141-CV

———————————

### UNION CARBIDE CORPORATION, Appellant

### V.

### DAISY E. SYNATZSKE AND GRACE ANNETTE WEBB, INDIVIDUALLY AND AS REPRESENTATIVES AND CO-EXECUTRIXES OF THE ESTATE OF JOSEPH EMMITE, SR., JOSEPH EMMITE, JR., DOROTHY A. DAY, VERA J. GIALMALVA AND JAMES R. EMMITE, Appellees

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2007-43950**

---

# EN BANC OPINION[1]

Appellant, Union Carbide Corporation ("Union Carbide"), has filed a motion for rehearing and for en banc reconsideration of this Court's June 30, 2011 opinion.[2] A majority of the Court has voted to grant en banc consideration. We withdraw our opinion and judgment of June 30, 2011, and we substitute this opinion and judgment in their place.

In this interlocutory appeal,[3] Union Carbide challenges the multi-district

---

1    The en banc court on reconsideration consists of Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Sharp, and Brown. Justices Massengale and Huddle are not participating in the decision of this case. *See* TEX. R. APP. P. 41.2(a) ("An en banc court consists of all members of the court who are not disqualified or recused and—if the case was originally argued before or decided by a panel—any members of the panel who are not members of the court but remain eligible for assignment to the court. A majority of the en banc court constitutes a quorum. A majority of the en banc court must agree on a judgment."). Sections I, II, III, and IV of this opinion, authored by Justice Jennings and joined by Justices Keyes, Higley, and Sharp, constitute the opinion of the Court. Section V of the opinion constitutes a plurality opinion. *See Tilton v. Marshall*, 925 S.W.2d 672, 675 n.1 (Tex. 1996) (identifying portions of opinion of Texas Supreme Court that was joined by majority as "opinion of the Court" and identifying remaining portions of opinion as plurality).

2    This case was originally submitted with oral argument to a panel consisting of Justices Jennings, Alcala, and Sharp. After submission, the Honorable Elsa Alcala left the Court to become a Judge on the Texas Court of Criminal Appeals. The case was, therefore, originally decided by the two remaining justices. *See* TEX. R. APP. P. 41.1(b).

3    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(11) (Vernon Supp. 2011) (providing for interlocutory appeal of denial of defendant's motion to dismiss, made pursuant to section 90.007 of Texas Civil Practice and Remedies Code, of claimant's asbestos-related injury claims); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 90.007 (Vernon 2011).

litigation ("MDL") pretrial court's order denying its motion and renewed motion to dismiss[4] the claims made against it by appellees, Daisy E. Synatzke and Grace Annette Webb, individually and as representatives and co-executrixes of the estate of Joseph Emmite, Sr., Joseph Emmite, Jr., Dorothy A. Day, Vera J. Gialmalva, and James R. Emmite (collectively, the "Emmites"), for the wrongful death[5] of Joseph Emmite Sr. ("Joseph"). Joseph's death, the Emmites allege, was caused by his exposure to asbestos when he worked for Union Carbide at its Texas City facility. In five issues, Union Carbide contends that the MDL pretrial court erred in denying its motion and renewed motion to dismiss the Emmites' asbestos-related injury claims on the grounds that the Emmites, without a motion or a showing of good cause, did not timely serve Union Carbide with a physician report, which is required to bring such claims pursuant to Chapter 90 of the Texas Civil Practice and Remedies Code,[6] and none of the physician reports that the Emmites served upon Union Carbide satisfy various requirements of Chapter 90, including the requirement that such a report "verify" that "pulmonary function testing" had been performed on Joseph and the physician making the report had

---

[4]     *See id.* § 90.007.

[5]     *See id.* §§ 71.002, 71.021 (Vernon 2008).

[6]     *See id.* §§ 90.003, 90.006, 90.010 (Vernon 2011).

3

interpreted the pulmonary function testing.[7] The Emmites contend that the requirement of such a verification of pulmonary function testing to pursue their asbestos-related injury claims under Chapter 90, which became effective after Joseph had been exposed to asbestos and died, violates the Texas Constitution's prohibition against retroactive laws.[8]

We affirm the order of the MDL pretrial court.

## I. Background

In their original petition, filed on June 7, 2007, the Emmites allege that Joseph, while employed by Union Carbide from 1940 to 1975, was exposed to asbestos and, as a result of this exposure, he contracted asbestosis and died on June 15, 2005. The Emmites attached to their original petition a physician report authored by Dr. R. Kradin.[9]

Union Carbide moved to dismiss the Emmites' claims, asserting that they had failed to serve it with an adequate physician report.[10] In response, the Emmites served upon Union Carbide a second physician report, dated August 9, 2007, authored by Dr. J.D. Britton. On September 14, 2007, during the MDL pretrial

---

[7] *See id.* §§ 90.003(a)(2)(D), 90.010(f)(1)(B)(ii).

[8] *See* TEX. CONST. art. I, § 16.

[9] *See id.* § 90.003 (prescribing filing of physician report when claimant asserts asbestos-related injury claim).

[10] *See id.* § 90.003(a)(2).

court's hearing on Union Carbide's motion, the Emmites asked the court to compel Union Carbide to produce from its personnel files Joseph's medical records. The Emmites sought to obtain the results of any pulmonary function testing that Union Carbide had performed on Joseph at the time that he had been employed by Union Carbide. At the end of the hearing, the court, stating that it considered this case to be "exceptional," orally denied Union Carbide's motion to dismiss "for good cause." The court instructed the Emmites to prepare an order denying Union Carbide's motion and setting forth its finding that their case involved an "exceptional circumstance."[11] After denying Union Carbide's motion to dismiss, the court did not address the Emmites' request to compel Union Carbide to produce Joseph's medical records.

On October 1, 2007, Union Carbide moved for reconsideration of the MDL pretrial court's oral ruling, and, at the beginning of the November 30, 2007 hearing on the motion, the court stated that it would not sign a written order denying Union Carbide' s motion to dismiss. In fact, the court made it clear to the parties that it

---

[11] The MDL pretrial court's oral finding that it considered this to be an "exceptional case" that involved "exceptional circumstance[s]" indicates that it concluded that the Emmites' physician reports should be evaluated under section 90.010(f)(1), not section 90.003(a)(2) of the Texas Civil Practice and Remedies Code. Section 90.010(f)(1), as explained below, prescribes an alternative method to satisfy Chapter 90's physician report requirement "in exceptional and limited circumstances in which the exposed person does not satisfy the medical criteria of Section 90.003 . . . but can demonstrate meaningful asbestos-related . . . impairment . . . ." *See id.* § 90.010(j).

5

did not intend to sign an appealable interlocutory order.[12]  After Union Carbide stated that this was "fine," the parties then discussed the Emmites' pending efforts to apply for an amended certificate of Joseph's death.  The Emmites represented that Dr. S. McClure, on the day before the hearing, had signed an application for an amended death certificate that would support a finding that asbestosis was at least one cause of Joseph's death.  Union Carbide complained that the affidavit that the Emmites proffered to substantiate this claim contained hearsay and it had not had the opportunity to depose McClure.  Union Carbide then placed in the record additional medical records for Joseph and his death certificate.  The court stated that it would keep the record open for six weeks and, if the Emmites filed an amended death certificate showing that asbestosis was a cause of Joseph's death, the court would deny Union Carbide's motion.

On January 14, 2008, the Emmites served, for a second time, Union Carbide with the August 9, 2007 physician report of Dr. Britton, and indicated that, given the "extraordinary circumstances" of this case, they intended to rely upon it as their required physician report.[13]  On January 18, 2008, the MDL pretrial court conducted a hearing, at which the Emmites expressed, consistent with their recent

---

[12]     The MDL pretrial court further remarked that if it eventually ruled against the Emmites and granted Union Carbide's motion to dismiss, then the Emmites would have the right to appeal.  These remarks further signal the court's intention to not sign an appealable order at this point in the proceedings.

[13]     *See id.* § 90.010(f)(1).

6

service of Britton's report upon Union Carbide, their intent to rely upon it as their required physician report. The Emmites explained that they were still trying to obtain a certified copy of Joseph's amended death certificate, and they requested "a full evidentiary hearing" to present witnesses and additional evidence.[14] The Emmites argued that their case presented an "extraordinary circumstance" because Union Carbide had produced to them Joseph's pulmonary function testing from when he had been a Union Carbide employee. The court granted the Emmites' request for a full evidentiary hearing, and it granted Union Carbide's request to depose Dr. McClure, who had signed Joseph's amended death certificate.

Although Union Carbide did not depose Dr. McClure until September 10, 2009, which was over one and one-half of a year after the MDL pretrial court's January 2008 hearing, a substantial portion of this delay was attributable to the fact that McClure had been seriously injured in an accident. And when Union Carbide did obtain McClure's deposition, she still suffered from some impairment due to her injuries. Shortly after obtaining McClure's deposition testimony, Union Carbide, on October 19, 2009, filed a "renewed" motion to dismiss the Emmites' claims.

In their November 5, 2009 response to the renewed motion to dismiss, the Emmites argued that Union Carbide had waived its right to seek dismissal because

---

[14] *See id.* § 90.010(g).

the parties had engaged in significant discovery and the motion was untimely filed. Moreover, the Emmites produced an October 28, 2009 physician report, authored by Dr. J. Prince, which they offered as an addendum to Prince's June 12, 2008 letter report that the Emmites had previously given to Union Carbide in the discovery process.

At its subsequent hearing on Union Carbide's renewed motion to dismiss, the MDL pretrial court instructed Union Carbide to file its written objections to Dr. Prince's report. The court explained that it wanted a complete record, including a copy of Prince's deposition, which had been obtained before the hearing. Pursuant to the court's instructions, Union Carbide filed its written objections to Prince's report. The Emmites then filed their response to Union Carbide's objections and Prince's December 2009 amended report, which had been prepared in an effort to respond to some of Union Carbide's written objections.

In his amended report, Dr. Prince, who had been Joseph's pulmonologist during a 2005 hospital visit, stated, in relevant part, that he had physically examined Joseph and provided him with a pulmonary consultation and treatment. Prince noted that Joseph was 85 years old at the time and had a medical history of benign prostatic hypertrophy, osteoarthritis, and dementia. Joseph, who also had a remote history of smoking cigars, had been brought to the emergency room "with a complaint of bilateral lower extremity edema as well as difficulty ambulating."

8

Prince took an occupational exposure history from Joseph, who told Prince that he had worked as an insulator at Union Carbide for many years and "had a possible diagnosis of asbestosis." Prince also noted that Joseph's chest exam revealed "diminished breath sounds at the right lung base with associated dullness to percussion." Moreover, Joseph was "somewhat confused" and "unable to support his own weight while" standing or sitting. The hospital admitted Joseph with pneumonia, and Prince noted "the presence of bilateral calcified pleural plaques consistent with a prior exposure to asbestos." After conducting a computed tomography scan of Joseph's chest and administering other diagnostic tests, Prince diagnosed Joseph as suffering from "pulmonary asbestosis."[15] Prince further noted,

> In summary, premorbid diagnostic workup was compatible with benign asbestos pleural effusion. The findings of an exudative pleural effusion, coupled with the presence of the diagnostic imaging revealing pleural plaques and bilateral, predominantly basilar, pulmonary fibrosis support my clinical diagnosis of *pulmonary asbestosis with significant impairment*. More than sixty years had elapsed from [Joseph's] first asbestos exposure. Even in the absence of postmortem data overwhelmingly supporting the clinical findings, I was able to exclude other more probable causes of the pulmonary findings identified in this patient's exposure, medical, and smoking history, and the postmortem data are merely confirmatory. *In an ideal clinical scenario, the treating physician would obtain pulmonary*

---

[15] In a post-submission letter, Union Carbide highlights one of Joseph's medical records, which reveals that, on May 6, 2005, Joseph saw his primary care physician regarding a "chief complaint of a cough" and Joseph presented with a "history" of numerous conditions and ailments, including "occupational lung disease (asbestosis)."

*function testing to include lung volumes and diffusion. However, . . . this man was severely debilitated to the point he was unable to support his own weight. . . . I have been provided and interpreted the results of pulmonary function testing given to [Joseph] on prior occasions. It is my medical opinion that this patient simply could not have performed such testing when I examined him*, due to his advanced dementia limiting his ability to follow instructions, his overall severely debilitated state, and that shortness of breath would have made such testing difficult or even prohibitive, even if he were capable of following instructions.

As noted above, pulmonary function testing would be clinically ideal to secure the diagnosis of pulmonary asbestosis. It is my opinion that had the patient been able to successfully undergo pulmonary function testing, restriction and diffusion abnormalities would have been identified, consistent with his clinical diagnosis of pulmonary asbestosis. *However*, in [Joseph's] case, *the clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue, confirm[] my opinion that [Joseph] had significant, advanced pulmonary asbestosis.* In making my diagnosis I have considered [Joseph's] other medical conditions— including immobility and pneumonia—and *it is my opinion that he had a pulmonary impairment from his asbestosis that was not more probably the result of other causes.*

(Emphasis added.)

On December 4, 2009, the MDL pretrial court granted Union Carbide's motion for reconsideration and conducted its final hearing, but the court did not rule on Union Carbide's renewed motion to dismiss. Rather, on December 22, 2009, the court, after considering all of the evidence, signed its order denying Union Carbide's motion to dismiss the Emmites' claims. In its order, the court made the following findings of fact:

1.    Joseph Emmite worked as an insulator for approximately 39

years at the Union Carbide Texas City facility;

2. The autopsy findings revealed asbestosis that had resulted in severe pulmonary fibrosis and the cause of death was the combined effects of retained asbestos fibers;

3. Texas Civil Practice and Remedies Code § 90.003 and 90.004 do not adequately assess Joseph Emmite's pulmonary impairment due to physical and mental limitations from which Mr. Emmite suffered;

4. Shortly before his death Mr. Emmite suffered from physical and mental limitations, which made it impossible for him to take a pulmonary function test;

5. Had Joseph Emmite been physically and mentally capable of performing a pulmonary function test, the results would have demonstrated pulmonary impairment greater than required under Texas Civil Practice and Remedies Code § 90.003;

6. Due to Joseph Emmite's physical and mental limitations, severe asbestosis, and death, the medical criteria set forth in Texas Civil Practice and Remedies Code § 90.003 do not adequately [assess] Mr. Emmite's physical impairment caused by exposure to asbestos;

7. Dr. Joseph Prince is a qualified, board-certified pulmonary specialist who served Mr. Emmite as his last treating physician;

8. In his report and testimony, Dr. Prince verified that pulmonary function testing had been previously performed on Mr. Emmite and that he interpreted the results;

9. Other than cross-examination of Dr. Prince at his deposition, Union Carbide offered no evidence, either by way of live expert testimony, depositions, or fact witnesses to contradict the findings of Dr. Joseph Prince, Mr. Emmite's treating physician;

10. Dr. Prince had no history of working as a litigation consultant. The testimony and opinions offered by Dr. Prince were at all

11

times credible, reliable and uncontroverted;

11. Joseph Emmite's case presents unique and extraordinary physical and medical characteristics justifying denial of Union Carbide's Motion to dismiss;

12. Mr. Emmite's family produced sufficient credible evidence to allow a finder of fact to reasonably find that Mr. Emmite's asbestos impairment is comparable to the impairment that an exposed person would have had if the exposed person met the criteria set forth in Section 90.003.

## II.    Asbestos-Related Injury Claims

On September 1, 2005, approximately eleven weeks after Joseph's death, Chapter 90 of the Texas Civil Practice and Remedies Code, which sets forth new procedures and requirements for claims involving asbestos- and silica-related injuries, became effective. TEX. CIV. PRAC. & REM. CODE ANN. §§ 90.001–.012 (Vernon 2011). The Texas Legislature, recognizing a growing "asbestos litigation crisis," which was proving to be "costly to employers, employees, litigants, and the court system,"[16] enacted Chapter 90 to protect "the right of people with impairing asbestos-related . . . injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system, while at the same time preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to asbestos . . . but have no functional or

---

[16] The Texas Legislature found that claims brought "by persons who are not functionally or physically impaired by any asbestos-related illness" had "severely hamper[ed] the ability of seriously ill claimants to seek redress in the courts." TEX. CIV. PRAC. & REM. CODE ANN. § 90.001 cmt. h (Vernon 2011).

12

physical impairment from asbestos-related . . . disease." *Id*. § 90.001 cmts. d, f, g,

n.  To fulfill these purposes, the legislature, through Chapter 90,

> (1)    adopt[ed] medically accepted standards for differentiating between individuals with nonmalignant asbestos-related . . . disease causing functional impairment and individuals with no functional impairment;
>
> (2)    provid[ed] a method to obtain the dismissal of lawsuits in which the exposed person has no functional impairment, while at the same time protecting a person's right to bring suit on discovering an impairing asbestos-related . . . injury; and
>
> (3)    create[d] an extended period before limitations begin to run in which to bring claims for injuries caused by the inhalation or ingestion of asbestos . . . to preserve the right of those who have been exposed to asbestos . . . but are not yet impaired to bring a claim later in the event that they develop an impairing asbestos-related . . . injury.

*Id*. § 90.001 cmt. n.

## A.    *Section 90.003's Physician Report Requirements*

A claimant asserting an asbestos-related injury[17] must serve on each

---

[17]    The requirements for a physician report in a claim involving malignant mesothelioma or another malignant asbestos-related cancer are significantly different. *See id*. § 90.003(a)(1).  In those cases, a claimant must file a physician report that states that the exposed person has been diagnosed with malignant mesothelioma or another malignant asbestos-related cancer and, to a reasonable degree of medical probability, exposure to asbestos was a cause of the diagnosed mesothelioma or other cancer in the exposed person. *Id*.

Here, Joseph was not diagnosed with malignant mesothelioma or another malignant asbestos-related cancer.  Rather, Joseph's alleged asbestos-related injury was asbestosis, and, in order to satisfy the Chapter 90 physician report requirements, the Emmites were required to file a report compliant with either

defendant "a report by a physician who is board certified in pulmonary medicine, internal medicine, or occupational medicine" that "verifies that the physician or a medical professional employed by and under the direct supervision and control of the physician":

> (i)    performed a physical examination of the exposed person, or if the exposed person is deceased, reviewed available records relating to the exposed person's medical condition;
>
> (ii)    took a detailed occupational and exposure history[18] from the exposed person or, if the exposed person is deceased, from a person knowledgeable about the alleged exposure or exposures that form the basis of the action; and
>
> (iii)    took a detailed medical and smoking history that includes a thorough review of the exposed person's past and present medical problems and their most probable cause[.]

*Id.* § 90.003(a)(2)(A). The report must set "out the details of the exposed person's occupational, exposure, medical, and smoking history" and verify that "at least 10 years have elapsed between the exposed person's first exposure to asbestos and the

---

section 90.003(a)(2) or section 90.010(f)(1) of the Texas Civil Practice and Remedies Code.

18    The "detailed occupational and exposure history" must describe (1) "the exposed person's principal employments and state whether the exposed person was exposed to airborne contaminants, including asbestos fibers and other dusts that can cause pulmonary impairment"; and (2) "the nature, duration, and frequency of the exposed person's exposure to airborne contaminants, including asbestos fibers and other dusts that can cause pulmonary impairment." *Id.* § 90.003(b). Other provisions of section 90.003, which are not relevant to this appeal, provide additional ways to satisfy section 90.003 if the claimant's pulmonary function test results or radiologic findings do not meet the above-stated requirements. *Id.* § 90.003(c), (d).

14

date of diagnosis[.]" *Id*. § 90.003(a)(2)(B).

Important to the issues presented in this case, the report, in addition to providing other detailed information, must "verif[y] that the exposed person has asbestos-related ***pulmonary impairment as demonstrated by pulmonary function testing***" showing:

>   (i)   forced vital capacity below the lower limit of normal or below 80 percent of predicted and FEV1/FVC ratio (using actual values) at or above the lower limit of normal or at or above 65 percent; or
>
>   (ii)  total lung capacity, by plethysmography or timed gas dilution, below the lower limit of normal or below 80 percent of predicted[.]

*Id*. § 90.003(a)(2)(D) (emphasis added).

The report must also verify that the physician "has concluded that the exposed person's medical findings and impairment were not more probably the result of causes other than asbestos exposure revealed by the exposed person's occupational, exposure, medical, and smoking history[.]" *Id*. § 90.003(a)(2)(E). Moreover, the report must be accompanied by copies of, among other items, all "pulmonary function tests, including printouts of all data, flow volume loops, and other information demonstrating compliance with the equipment, quality, interpretation, and reporting standards set out" in Chapter 90.[19] *Id*. §

---

[19] The comments to section 90.001 further evidence the Texas Legislature's intent in enacting such detailed requirements for a physician report in claims not involving

90.003(a)(2)(F). The claimant must serve upon each defendant the physician report prescribed by section 90.003 "not later than the 30th day after the date that defendant answers or otherwise enters an appearance in the action."[20]  *Id.* § 90.006(a).

A defendant may file a motion to dismiss a claimant's asbestos-related injury claims if the claimant has not timely served a physician report on the defendant or the report does not comply with the requirements of section 90.003. *Id.* § 90.007(a). The motion must be filed on or before the 30th day after the date the report is served on the defendant, and, if the basis of the motion is that the report does not comply with section 90.003, "the motion must include the reasons why the report does not comply with that section." *Id.* The claimant may file a

---

malignant mesothelioma or another malignant asbestos-related cancer. As explained by the legislature, "the asbestos litigation crisis" was "due, in part, to screening of persons with possible occupational exposure to asbestos," which identified individuals as suffering from asbestos-related disease "regardless of whether the individuals have any physical impairment." *Id.* § 90.001 cmt. f. The legislature noted that such individuals "file lawsuits, in part to avoid the running of limitations triggered by the discovery that they may have an asbestos-related injury," and the legislature further noted that "[m]any of the identified individuals," possibly as many as "90 percent," were not experiencing any symptoms from asbestos-related disease "affecting their daily functions." *Id.*

[20] As discussed below, section 90.006 prescribes different deadlines for serving a physician report depending on whether the action was filed on or after the effective date of Chapter 90 or was already pending on the effective date of Chapter 90. Here, the Emmites filed their claims after the effective date of Chapter 90. We note that even if the Emmites had filed their claims after Joseph's death in June 2005, but before Chapter 90's effective date in September 2005, they still likely would have had to serve Union Carbide with a physician report to maintain their claims. *Id.* § 90.006(b), (c).

16

response to a motion to dismiss on or before the 15th day after the date the motion to dismiss is served. *Id*. § 90.007(b). A report required by section 90.003 may be filed, amended, or supplemented within the time required for responding to a motion to dismiss. *Id*. If a court is of the opinion that the motion to dismiss is meritorious, it must, except as provided by section 90.010(d) or (e), "by written order, grant the motion and dismiss all of the claimant's asbestos-related claims." *Id*. § 90.007(c). Any such dismissal is "without prejudice to the claimant's right, if any, to assert claims for an asbestos-related injury . . . in a subsequent action." *Id*. On the filing of a motion to dismiss, "all further proceedings in the action are stayed until the motion is heard and determined by the court." *Id*. § 90.007(d). And, on the motion of a party showing good cause, the court may shorten or extend the time limits provided for filing or serving motions, responses, or reports. *Id*. § 90.007(e).

**B.**    ***Physician Report Requirements in "Exceptional and Limited Circumstances"***

Chapter 90 does provide alternative reporting requirements, which "apply only in exceptional and limited circumstances in which an exposed person does not satisfy the medical criteria of Section 90.003 . . . but can demonstrate meaningful asbestos-related . . . physical impairment . . . ." *Id*. §90.010(j). If a claimant "does not serve on a defendant a [physician] report that complies with section 90.003," an MDL pretrial court "shall, on motion of the defendant, dismiss the action under

section 90.007, ***unless***,"

> (1)     the claimant serves a report that complies with [section 90.010](f)(1) and
>
> (2)     the court, on motion and hearing, makes the findings required by section [90.010](f)(2).

*Id*. §§ 90.007(e), 90.010(e) (emphasis added).  A claimant seeking a remand for trial on the denial of a motion to dismiss under section 90.010(e) must serve on each defendant a report that:

> (A)     complies with the requirements of Sections 90.003(a)(2)(A), (B), (E), and (F) and 90.003(b) . . . ; and
>
> (B)     verifies that:
>
> > (i)      the physician making the report has a physician-patient relationship with the exposed person;
> >
> > (ii)     ***pulmonary function testing has been performed on the exposed person and the physician making the report has interpreted the pulmonary function testing***;
> >
> > (iii)    the physician making the report has concluded, to a reasonable degree of medical probability, that the exposed person has radiographic, pathologic, or computed tomography evidence establishing bilateral pleural disease or bilateral parenchymal disease caused by exposure to asbestos . . . ; ***and***
> >
> > (iv)    the physician has concluded that the exposed person ***has asbestos-related . . . physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003 or 90.004[.]***

*Id.* § 90.010(f)(1) (emphasis added). Moreover, the MDL pretrial court "shall determine" whether,

(A) the report and medical opinions offered by the claimant are reliable and credible;

(B) due to *unique or extraordinary physical or medical characteristics of the exposed person, the medical criteria set forth in Sections 90.003 and 90.004 do not adequately assess the exposed person's physical impairment* caused by exposure to asbestos . . . ; and

(C) the claimant has produced sufficient credible evidence for a finder of fact to reasonably find that the exposed person is physically impaired as the result of exposure to asbestos . . . to a degree comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003 . . . .

*Id.* § 90.010(f)(2) (emphasis added). The MDL pretrial court must state its findings, made under section 90.010(f)(2), in writing and address in its findings:

(1) the unique or extraordinary physical or medical characteristics of the exposed person that justify the application of this section; and

(2) the reasons the criteria set forth in Sections 90.003 and 90.004 do not adequately assess the exposed person's physical impairment caused by exposure to asbestos . . . .

*Id.* § 90.010(h). Again, we emphasize that subsections 90.010(e) and (f) "apply only in exceptional and limited circumstances in which the exposed person does not satisfy the medical criteria of Section 90.003 . . . but can demonstrate meaningful asbestos-related . . . physical impairment that satisfies the requirements

19

of Subsection (f)." *Id.* § 90.010(j).

### III. Timeliness of Physician Reports

In its first issue, Union Carbide argues that the MDL pretrial court erred in denying its motion to dismiss the Emmites' asbestos-related injury claims because they failed to timely serve Union Carbide with a "complying [physician] report demonstrating a threshold level of asbestos-related impairment" and their "late filings were not supported by written or oral motions, nor by a showing of good cause." *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 90.003(a)(2), 90.006(a), 90.007.

Union Carbide specifically argues that the MDL pretrial court abused its discretion in relying upon any physician reports and evidence, other than Dr. Kradin's report and Dr. Britton's August 9, 2007 report, both of which the Emmites had timely served upon Union Carbide before the court's September 14, 2007 hearing, because the Emmites did not move for an extension of time, request an opportunity to offer additional evidence, or make a showing of good cause to support their untimely service of subsequent reports and evidence. Union Carbide asserts that the MDL pretrial court "lacked jurisdiction to deviate sua sponte over the last two and a half years from Chapter 90's specific timing requirements" and could not properly consider the "untimely new evidence" and reports, including those of Dr. Prince, by relying upon subsections 90.010(e), (f), (g), and (j).

20

The Emmites timely filed, with their original petition, the physician report of Dr. Kradin,[21] and Union Carbide timely filed its motion to dismiss the Emmites' claims on the ground that the report did not comply with section 90.003(a)(2). The MDL pretrial court promptly held its September 14, 2007 hearing on Union Carbide's motion and orally denied it at the hearing. Despite Union Carbide's complaints that the Emmites did not move for an extension of time, request an opportunity to offer additional evidence, or make a showing of good cause to support their untimely reports and evidence, the Emmites, because they prevailed at the hearing, had no reason to make such a request or showing.[22]

The MDL pretrial court did not reduce its oral ruling to writing, and Union Carbide, in its briefing, concedes that it could have sought to obtain, at that time, a written order from the court denying its motion to dismiss; it elected instead to file a motion to reconsider. At the November 30, 2007 hearing on Union Carbide's

---

[21]   The Emmites concede on appeal that the physician reports of Dr. Kradin and Dr. Britton, both served upon Union Carbide prior to the MDL pretrial court's September 14, 2007 hearing, did not comply with the requirements of section 90.003(a)(2). However, they assert that their subsequently-filed physician reports of Dr. Prince, along with other evidence, comply with the requirements of section 90.010(f)(1).

[22]   We note that the Emmites, at the September 14, 2007 hearing, specifically requested that Union Carbide be compelled to produce its records regarding Joseph, including records related to any pulmonary function testing that had been performed on him at Union Carbide in the 1960s and 1970s. After the MDL pretrial court orally denied Union Carbide's motion, the court did not rule upon the Emmites' discovery request.

motion to reconsider, the court made it clear that it was reconsidering whether the Emmites' claims should be dismissed. At the conclusion of the hearing, the court also made it clear that it was no longer willing to sign a written, appealable interlocutory order, despite its prior oral ruling. Because Union Carbide did not object or seek any other relief from the court's decision to not sign a written order, it foreclosed its right to bring an interlocutory appeal at that time. *See* TEX. R. APP. P. 26.1 (providing that notice of appeal in accelerated appeal must be filed within 20 days after order is signed).

Moreover, the Emmites, at the November 30, 2007 hearing on Union Carbide's motion for the MDL pretrial court to reconsider its oral denial of Union Carbide's motion to dismiss, told the court that they had recently submitted an application for an amended certificate of Joseph's death, which they believed would identify asbestosis as a cause of his death.[23] Implicit in the court's decision to "keep the record open for an additional six weeks" is that it considered the Emmites' oral statements as a request for additional time to introduce into the record supplemental evidence, which, the Emmites believed, would bear upon the court's ultimate decision as to whether to dismiss their claims. *See* TEX. CIV.

---

[23] On the same day of this hearing, the Emmites filed a motion to open discovery and to compel Union Carbide to produce Joseph's personnel and medical file. The Emmites specifically asserted that Union Carbide was in possession of missing evidence that Joseph had had pulmonary function testing performed on him that would enable the Emmites to satisfy the requirements of Chapter 90.

PRAC. & REM. CODE ANN. § 90.007(e). A court has the discretion to, "[o]n the motion of a party showing good cause," "extend the time limits . . . for filing or serving motions, responses, or reports." *Id*. Here, the record indicates that the court construed the oral statements made by the Emmites at the hearing as a motion for an extension of time, and the record supports the court's implied finding that good cause supported such an extension. *See id*. Accordingly, we hold that the MDL pretrial court acted within its discretion under section 90.007(e) in allowing the Emmites additional time to supplement their response or their reports. *See id*.

At the subsequent January 18, 2008 hearing, the Emmites stated their intention, consistent with their January 14, 2008 second service upon Union Carbide of Dr. Britton's report, to comply with the physician report requirements of section 90.010(f)(1), and not section 90.003(a)(2), under which they had been previously proceeding. The Emmites explained that they were doing so, in part, because they had received from Union Carbide evidence of pulmonary function testing that had been performed on Joseph during his employment at Union Carbide. Implicit in the Emmites' statements to the MDL pretrial court is the assertion that the testing evidence was relevant and necessary for them to comply with section 90.010(f)(1)(B)(ii) and a request to allow them to rely upon it at a time when the court was still considering Union Carbide's motion to reconsider its

original motion to dismiss. There is nothing in section 90.010, or in Chapter 90, that precluded the Emmites from invoking section 90.010(f)(1) after they had previously sought to comply with section 90.003(a)(2).

In regard to Union Carbide's complaint that the MDL pretrial court abused its discretion in not granting its motion to dismiss under Chapter 90's "strict" deadlines, an MDL pretrial court must, on a motion by a defendant under section 90.007, dismiss an action unless the claimant serves a physician report upon the defendant that complies with section 90.010(f)(1) and the court, on motion and hearing, makes the findings required by section 90.010(f)(2). *Id*. § 90.010(e). However, section 90.010 does not contain a deadline for a claimant to file a physician report that complies with section 90.010(f)(1). And, as discussed below, section 90.010 mandates a discovery period and evidentiary hearing. *See id*. § 90.010(g). Moreover, although section 90.006, entitled "Serving Reports," provides that a report prescribed by section 90.003 must be served no later than the 30th day after a defendant answers or appears in an action, it contains no reference to a deadline for service of a report under section 90.010(f)(1). *Id*. § 90.006.

We further note that a court has the discretion to "extend the time limits . . . for filing or serving motions, responses, or reports." *See id*. § 90.007(e). And section 90.007 specifically provides that a court shall grant a motion to dismiss a claimant's asbestos-related claims for failure to timely serve a report that does not

comply with section 90.003, "*[e]xcept* as provided by" section 90.010. *See id.* § 90.007(c) (emphasis added). Here, the Emmites invoked section 90.010(f)(1) at a time when the MDL pretrial court was still entertaining Union Carbide's motion to dismiss the Emmites' claims. Although section 90.010(e) refers to motions to dismiss under section 90.007, section 90.010 contains several provisions that authorize an MDL pretrial court to handle cases in which section 90.010(f)(1) is invoked much differently than cases in which a claimant offers a physician report under section 90.003(a).

When a claimant asserting an asbestos-related injury claim seeks to satisfy Chapter 90 by serving a physician report pursuant to section 90.010(f)(1), the procedures for handling a motion to dismiss are necessarily different from those established regarding a physician report served pursuant to section 90.003(a). First, although section 90.010(e) provides that an MDL pretrial court must dismiss a claimant's asbestos-related injury claim for failure to serve a compliant report, the court, if subsection (f) is invoked, must conduct an evidentiary hearing "at which the *claimant* and any defendant to the action may offer supporting or controverting evidence." *Id.* § 90.010(g) (emphasis added). Second, the court must provide the parties with a reasonable discovery period before the evidentiary hearing. *Id.* Thus, section 90.010 expressly contemplates that, once a party invokes subsection (f), that party will be entitled to obtain additional discovery and

introduce additional evidence supporting its claims.[24]

In sum, section 90.010 necessarily contemplates that a physician report may be supplemented with additional physician reports or evidence offered by a claimant in order to render an original report compliant with Chapter 90. Here, once the Emmites invoked section 90.010(f) and requested a full evidentiary hearing (at a time when the trial court was considering Union Carbide's pending motion to reconsider its motion to dismiss), the parties were entitled to engage in discovery for a reasonable period of time. *Id.* § 90.010(g). During this period,

---

[24] We do not suggest that discovery or evidentiary hearings would not be available under any circumstances under section 90.003, but we note that section 90.010(g) expressly authorizes such procedures. However, we also note that section 90.007(d) provides for a stay in proceedings "[o]n the filing of a motion to dismiss under this section" until the motion "is heard and determined." *See id.* § 90.007(d). Union Carbide's argument that section 90.007's "strict" deadlines should be applied even in the context of a party invoking section 90.010(f) ignores the inherent conflict between the stay provision in section 90.007(d) and the discovery period authorized under section 90.010(g).

Union Carbide also suggests that the legislature, in drafting section 90.006, which provides that a report prescribed by section 90.003 must be served no later than 30 days after the defendant answers or appears in the action, inadvertently failed to reference section 90.010. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 90.006(a). Union Carbide asks us to "apply equally" section 90.006's deadlines to section 90.010. But, again, as noted above, Union Carbide agrees that section 90.006 does not reference section 90.010, and section 90.007(e) allows a court, upon motion showing good cause, the discretion to "extend the time limits . . . for filing or serving motions, responses, or reports." *See id.* § 90.007(e). Simply put, although Union Carbide complains that the result reached in this case "undermines the legislature's intent" to "weed out claims by or on behalf of the unimpaired early in the litigation," the trial court, in the specific circumstances here, did not act in violation of the procedures expressly authorized by Chapter 90, as it is currently drafted.

26

Union Carbide took the deposition of Dr. McClure and thereafter filed its renewed motion to dismiss. In response, the Emmites, prior to the evidentiary hearing, supplemented the record with two additional physician reports by Dr. Prince, Joseph's treating pulmonologist. Union Carbide filed written objections to Prince's reports and, during the discovery period, also deposed Prince. We hold that the MDL pretrial court did not abuse its discretion in considering the motion, responses, and reports, including those of Dr. Britton and Dr. Prince, and all other evidence presented at and discussed during the evidentiary hearing in determining whether the Emmites' physician reports satisfied the requirements of section 90.010(f)(1). *See id.* Accordingly, we further hold that the MDL pretrial court did not err in denying Union Carbide's motion and renewed motion to dismiss on the ground that the Emmites, without a motion or a showing of good cause, did not timely serve Union Carbide with a physician report.

We overrule Union Carbide's first issue.

### IV.    Adequacy of Required Physician Reports

In its second, third, fourth, and fifth issues, Union Carbide argues that the MDL pretrial court erred in denying its motion and renewed motion to dismiss the Emmites' asbestos-related injury claims because none of the Emmites' physician reports comply with the requirements of Chapter 90.

Before we address these issues, we note that the Emmites argue that Union

27

Carbide has waived any error in regard to the MDL pretrial court's denial of its motion and renewed motion to dismiss the Emmites' claims on the ground that their physician reports do not comply with the requirements of Chapter 90 because Union Carbide participated in discovery during the period between the court's January 18, 2008 hearing and the filing of the renewed motion to dismiss in October 2009. *See id.* § 90.007(d) (providing for stay of all proceedings until motion to dismiss under section 90.007 is heard and determined). The Emmites assert that Union Carbide cannot appeal the trial court's September 14, 2007 oral ruling and, even if it could, Union Carbide's appeal is untimely.

In regard to the Emmites' untimely-appeal argument, Union Carbide agrees that it is not bringing an interlocutory appeal of the MDL pretrial court's September 14, 2007 oral ruling. Although Union Carbide argues that we should limit our consideration of the court's December 2009 order to the two original reports of Drs. Kradin and Britton, which were served on Union Carbide by the Emmites prior to the first hearing in September 2007, this argument fails because (1) Union Carbide filed a motion to reconsider, (2) Chapter 90 provided the court with discretion in extending deadlines to file motions, responses, and reports, (3) the Emmites invoked section 90.010(f) at a time when the court was still entertaining Union Carbide's motion to dismiss and motion for reconsideration, (4) nothing in Chapter 90 precluded the Emmites from seeking to satisfy Chapter 90

28

through section 90.010(f), and (5) section 90.010(g) contemplates a discovery period and an evidentiary hearing at which the parties are offered the opportunity to supplement the record with additional evidence.

In regard to the Emmites' waiver argument, the record contains an explanation for the delay in Dr. McClure's deposition and the associated delay for Union Carbide's filing of its renewed motion to dismiss. Although it is undisputed that Union Carbide participated in some discovery during the period between the filing of its original motion to dismiss and its renewed motion to dismiss, it had a right to do so under section 90.010(g) and the record otherwise demonstrates that Union Carbide did not waive any error in regard to the MDL pretrial court's ruling on its renewed motion to dismiss.

## A.    *Section 90.003(a)(2) Physician Reports*

In its second issue, Union Carbide argues that the physician reports by Dr. Kradin and Dr. Britton do not comply with section 90.003(a)(2) because they do not include, among other requirements, a detailed occupational and exposure history and a detailed medical and smoking history. *See id.* §§ 90.003(a)(2)(A)(ii)–(iii), 90.003(b). Union Carbide also asserts that these reports do not include a verification that Joseph had an asbestos-related impairment as demonstrated by pulmonary function testing and a verification that the doctors had concluded that Joseph's impairment was not more probably the result of

29

causes other than asbestos exposure. *See id.* § 90.003(a)(2)(D), (E).

The Emmites concede that Dr. Kradin's report and Dr. Britton's report, which they originally served on Union Carbide in order to comply with section 90.003(a)(2), do not comply with the requirements of that section.

We sustain Union Carbide's second issue.

**B.      *Section 90.010(f)(1) Physician Reports***

In its third, fourth, and fifth issues, Union Carbide argues that the physician reports of Dr. Prince[25] do not comply with section 90.010(f)(1), which itself requires compliance with several subsections of section 90.003, because Prince did not conduct a thorough review of Joseph's past and present medical problems, he did not "set out the details of [Joseph's] medical history," and his reports do not otherwise comply with pertinent subsections of section 90.003. *See id.* §§ 90.003(a)(2)(A), (B), (E), (F); 90.003(b); 90.010(f)(1)(A). Union Carbide asserts that the "primary problem" with Prince's reports is that they make reference to "40 year old pulmonary function test results reflecting no impairment" and he "did not rely" on these reports "in reaching his conclusions about impairment." *See id.* § 90.003(f)(1)(B)(ii). Union Carbide notes that although the legislature, by

---

[25]     Within its third, fourth, and fifth issues, Union Carbide also asserts that Dr. Britton's report, which the Emmites served for a second time upon Union Carbide in their effort to comply with section 90.010(f)(1), does not comply with that section. The Emmites do not challenge this assertion, but they contend that the reports authored by Dr. Prince satisfy the requirements of section 90.010(f)(1).

providing the alternative physician report requirements of section 90.010(f)(1), relaxed a number of the physician report requirements of section 90.003(a), pulmonary function testing must still constitute a part of a treating physician's determination of impairment. *See id.*

Union Carbide specifically argues that Dr. Prince's first report does not comply with several pertinent subsections of section 90.003 and 90.010 because Prince failed to conduct "a thorough review" of Joseph's "past and present medical problems"; set out the details of Joseph's medical history; review Joseph's other medical records from Joseph's 2004 and 2005 hospital admissions or any other medical records; detail Joseph's "long history of serious medical conditions"; refer to Joseph's pneumonia diagnosis—"the very condition for which he was admitted to the hospital" and that "eventually caused his death"; give "sufficient weight" to Joseph's "other medical infirmities"; verify that he concluded that Joseph's impairment was "not more probably the result of causes other than asbestos exposure"; exclude other causes of "medical findings and impairment"; or "exclude the most probable cause of any pulmonary impairment," i.e., his pneumonia. *See id.* §§ 90.003(a)(2)(A), (B), (E), (F); 90.003(b); 90.010(f)(1). Union Carbide asserts that even if Prince's first report was not "facially deficient," his "wholesale failure" to review Joseph's medical records and to analyze the impact of other medical conditions renders "his opinions less than reliable and

31

credible."

Union Carbide acknowledges that Dr. Prince's second report "facially remedied some of [its] objections" to Prince's first report, but Union Carbide asserts that "the boilerplate fashion" in which this report remedied those objections "renders its credibility suspect." Union Carbide asserts that the second report is "still deficient despite [Prince's] professing to have looked" at additional medical records because he did not consider other "earlier records" and his "new report still contained no detailing of [Joseph's] medical history and probable causes of medical diagnosis."

Our review of Dr. Prince's second report reveals that he served as Joseph's treating physician in 2005, approximately one month before Joseph's death. In his second report, Prince discussed Joseph's medical and smoking history, a number of medical conditions from which Joseph had suffered, and Joseph's occupational exposure history. Prince identified all of the medical records that he reviewed; stated that he reviewed Joseph's "detailed occupational exposure history," which had been provided by one of Joseph's "fellow insulator/asbestos [] coworkers who was knowledgeable about his workplace exposure to asbestos and other substances"; stated that he was attaching these materials to his report; and explained that all of his opinions included "consideration of [Joseph's] past and final medical problems and their most probable causes." Prince described Joseph's

occupational exposure history, stated that he personally performed a physical examination of Joseph in May 2005 when he was hospitalized, stated that he provided "pulmonary consultation" and "rendered treatment," and confirmed that he "developed a physician-patient relationship with [Joseph] as one of his treating physicians." Prince diagnosed Joseph with "pulmonary asbestosis with significant impairment."

Dr. Prince further noted that he was "able to exclude other more probable causes of the pulmonary findings identified" in Joseph's exposure, medical, and smoking history. Prince opined, based upon "the clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue," that Joseph had "significant, advanced pulmonary asbestosis." Prince noted that, in making this diagnosis, he considered Joseph's other medical conditions, including pneumonia, and he confirmed his opinion that Joseph suffered from pulmonary impairment "from his asbestosis that was not more probably the result of other causes." Even if Prince's second report could have included more detail about Joseph's medical and occupational history, we cannot say that the MDL pretrial court abused its discretion in overruling the objections of Union Carbide that were not based on the pulmonary function testing requirement of section 90.010(f)(1)(B)(ii).

In addressing what Union Carbide describes as "the primary problem" with

Dr. Prince's second report, i.e., his use of "40-year old pulmonary function test results reflecting no impairment" upon which he "did not rely" "in reaching his conclusions about [Joseph's] impairment," we understand that, in his report, Prince concluded that Joseph had suffered from "pulmonary asbestosis with significant impairment." Prince "was able to exclude other more probable causes of the pulmonary findings identified" in Joseph's exposure, medical, and smoking history. And Prince maintained that, even without the pulmonary function testing, Joseph's "clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue," confirmed his diagnosis. Nevertheless, Prince himself agreed that, "[i]n an ideal clinical scenario," he would have liked to have performed pulmonary function testing on Joseph. He noted, however, that, on the date that he saw Joseph, such testing would have been "difficult or even prohibitive."

As noted above, the Texas Legislature has expressly provided that a claimant seeking to satisfy Chapter 90's physician report requirements under section 90.010 must serve on each defendant a report that verifies, among other things, that the physician making the report has a physician-patient relationship with the exposed person and that "pulmonary function testing has been performed on the exposed person and the physician making the report has interpreted the pulmonary function testing." *See id.* § 90.010(f)(1)(B)(i)–(ii).

34

The Emmites agree, and Dr. Prince's reports reveal, that Prince did not perform pulmonary function testing on Joseph, nor did anyone else during the time period in which the Emmites allege that Joseph suffered from an asbestos-related impairment. The only evidence in the record that pulmonary function testing had been performed on Joseph related to testing performed by Union Carbide in the 1960s and 1970s, approximately forty years before Joseph's death. It is undisputed that this testing revealed no impairment at the time it was administered, and neither Prince nor the Emmites rely upon this testing as proof that Joseph suffered from an asbestos-related impairment during his lifetime or that he died as a result of his asbestos exposure. Prince conceded in his deposition that he did not use pulmonary function testing to support his diagnosis; rather, he agreed that he could not rely upon such testing in making his diagnosis because, at the time he treated Joseph, Joseph could not participate in pulmonary function testing.

We cannot accept the Emmites' argument that Dr. Prince's reports comply with section 90.010(f)(1)(B)(ii) merely because they reference the results of the Union Carbide pulmonary function testing and Prince reviewed the results. As conceded by the Emmites, the Union Carbide pulmonary function testing was not relevant to Prince's diagnosis of Joseph. Thus, under their argument, the Emmites would be able to pursue their asbestos-related injury claims only as a result of the fortuity of the fact that Union Carbide had pulmonary function testing, the results

35

of which were irrelevant to Prince's diagnosis, performed on Joseph in the 1960s or 1970s.

Allowing asbestos-related injury claimants to pursue their claims by satisfying the physician report requirements of Chapter 90 with an employer's or another party's pulmonary function testing, performed on an exposed person many years prior to any alleged asbestos-related impairment, and the results of which are irrelevant to a diagnosis of impairment, would result in the arbitrary treatment of claimants. The Texas Legislature, through Chapter 90, has elected to require those claiming non-cancerous asbestos-related injuries to substantiate the injuries with required physician reports, which themselves require pulmonary function testing. Section 90.010(f)(1)(B)(ii) plainly requires a treating physician to verify the performance of pulmonary function testing on an exposed person and interpret the testing. Although it, unlike section 90.003(a)(2)(D), does not require a showing of any specific minimal impairment, we conclude that the only reasonable interpretation of section 90.010(f)(1)(B)(ii) is that such testing must be considered by the physician in making his diagnosis. Therefore, the pulmonary function testing must be relevant to any diagnosis of impairment.

Our conclusion is supported by the Texas Legislature's expressly stated reasons for enacting Chapter 90 and the plain language of section 90.010(f)(1)(B) when read in its entirety and in context with section 90.003(a)(2)(D). The

36

legislature enacted Chapter 90 in large part to "provide[] a method to obtain the dismissal of lawsuits in which the exposed person has no functional impairment," while protecting the legal rights of exposed persons with manifested asbestos-related functional impairment. *Id*. § 90.001 cmt. n. In doing so, it "adopt[ed] medically accepted standards for differentiating between individuals with nonmalignant asbestos-related . . . disease causing functional impairment and individuals with no functional impairment." *Id*. Critical to fulfilling these medical standards is pulmonary function testing. In section 90.003(a)(2)(D), the legislature requires "verif[ication] of [certain specific minimal] pulmonary impairment as demonstrated by pulmonary function testing." Although section 90.010(f)(1)(B) does not require a showing of any specific minimal impairment, it also requires that pulmonary function testing be performed on an exposed person and the testing be interpreted by the person's physician. And the physician interpreting any pulmonary function testing must be board certified in "pulmonary medicine, internal medicine, or occupational medicine." *Id.* § 90.002(2). Moreover, subsection (ii) of 90.010(f)(1)(B), which addresses the requirement of pulmonary function testing in extraordinary cases, should not be read in isolation, but must be read in the context of each of the requirements of section 90.010(f)(1)(B) joined together, especially subsection (iv), which requires that the physician conclude that "the exposed person has asbestos-related . . . physical impairment comparable to

37

the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003 . . . ." Although, as Union Carbide candidly concedes, pulmonary function testing during Joseph's "last few months of life was likely unobtainable," Dr. Prince's reports simply cannot satisfy the requirements of section 90.010(f)(1)(B) without pulmonary function testing relevant to his diagnosis of impairment.[26]

Accordingly, we hold that the pulmonary function testing performed on Joseph by Union Carbide approximately forty years before Joseph's death, and which was irrelevant to Dr. Prince's diagnosis of impairment, cannot be used to satisfy the pulmonary function testing requirement of section 90.010(f)(1)(B)(ii). We further hold that the MDL pretrial court erred in concluding that Prince's reports satisfied the requirements of section 90.010(f)(1)(B)(ii). We sustain the

---

[26] We note that portions of section 90.003 specifically contemplate that a claimant may bring a wrongful death action related to a deceased person's exposure to asbestos and resulting asbestos-related injury. *See id.* § 90.003(a)(2)(A)(i), (ii) (stating that claimant must file report that verifies that physician or medical professional "performed a physical examination of the exposed person, *or if the exposed person is deceased*, reviewed available records relating to the exposed person's medical condition" and "took a detailed occupational and exposure history from the exposed person *or, if the exposed person is deceased*, from a person knowledgeable about the alleged exposure or exposures that form the basis of the action"). Section 90.010(f) includes these requirements. *See id.* § 90.010(f)(1)(A) (stating that claimant must serve a report that, among other things, "complies with the requirements of Sections 90.003(a)(2)(A)"). Yet, section 90.010(f) also includes the requirement of pulmonary function testing, and it makes no distinction for exposed persons who are deceased and those who are not. *See id.* § 90.010(f)(1)(B)(ii).

portions of Union Carbide's third, fourth, and fifth issues in which it contends that the Emmite's physician reports do not satisfy the requirements of section 90.010(f)(1)(B)(ii).

## V. Constitutionality of Section 90.010(f)(1)(B)(ii)

The Emmites argue that if Dr. Prince's reports do not satisfy the requirements of section 90.010(f)(1)(B)(ii) on the ground that they lack a verification that pulmonary function testing had been performed on Joseph and the physician making the report has interpreted the testing, section 90.010(f)(1)(B)(ii), as applied to them, violates the Texas Constitution's prohibition against retroactive laws. *See* TEX. CONST. art. I, § 16. The Emmites assert that when Joseph died, "his family's rights became vested against those who caused his injury and, at that time," a pulmonary function test was "not required to bring an asbestos claim." The Emmites argue that "[i]f a law enacted after [Joseph] could no longer take a breathing test retroactively requires such a test, it is unconstitutional."

Prior to submission, Union Carbide argued that because the Emmites "had not secured a final judgment" on the effective date of Chapter 90, they had no vested right to pursue their claims without satisfying the pulmonary function testing requirement of section 90.010(f)(1)(B)(ii). Union Carbide also argued that, even if the requirements of section 90.010(f)(1)(B)(ii) affected the Emmites' vested rights, the Texas Legislature acted constitutionally and properly in

39

exercising its "police power in balancing the legitimate expectations" of claimants against the need to control the "crush of asbestos litigation." Union Carbide asserted that the Emmites' "claim of a vested right is even more dubious because their cause of action is based on a statute—the Texas Wrongful Death Act." *See id.* §§ 71.002, 71.021 (Vernon 2008) (providing for statutory wrongful death and survival claims).

Union Carbide, in its post-submission briefing and rehearing motion, notes that the Texas Supreme Court has recently and "fundamentally changed the landscape of constitutional retroactivity analysis in this state." *See Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 137 (Tex. 2010). Union Carbide asserts that the supreme court, in *Robinson*, disposed of the "much maligned and ultimately unfathomable 'vested rights analysis," and, under its new test, section 90.010(f)(1)(B)(ii), as applied to the Emmittes' claims, passes constitutional muster. As part of its argument, Union Carbide notes that the Emmites' claims are based on a statute—the Texas Wrongful Death Act—and as such the retroactivity analysis involves different considerations. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.002, 71.021.

The Texas Constitution, in our Bill of Rights, provides, in no uncertain terms, that

> *No* bill of attainder, ex post facto law, *retroactive law*, or any law impairing the obligation of contracts, *shall be made*.

TEX. CONST. art. I, § 16 (emphasis added).  The Bill of Rights further provides that

> To guard against transgressions of the high powers herein delegated, we declare that everything in the "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions are void.

*Id*. art. I, § 29.

We begin our analysis with the presumption that a statute is constitutional, and a party challenging its constitutionality bears the burden of demonstrating that it fails to pass constitutional muster.  *See Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 934 (Tex. 1996).  However, when the legislature has done that which our Bill of Rights forbids, it is the duty of the judiciary to declare such enactments null and void.  *See, e.g.*, *Bronson v. Kinzie*, 42 U.S. 311, 1 How. 311, 11 L. Ed. 143 (1843).  Thus, we must examine the express words of the constitution to determine if a valid reason exists to defeat the presumption of a statute's validity.  *Cox v. Robison*, 105 Tex. 426, 430, 150 S.W. 1149, 1151 (1912).  In interpreting the Texas Constitution, Texas courts must rely heavily on the literal text and must give effect to its plain language.[27]  *Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 89 (Tex. 1997).  If any provision of a statute is held

---

[27]     Justice Frost of our sister court has noted that "[t]he people of the State of Texas, in emphatic and compelling language set forth in section 29 of the Texas Bill of Rights, have expressly withheld from the Legislature the authority to enact retroactive laws in violation of section 16 of the Texas Bill of Rights."  *Robinson v. Crown Cork & Seal Co.*, 251 S.W.3d 520, 541 (Tex. App.—Houston [14th Dist.] 2006) (Frost, J., dissenting), *rev'd*, 335 S.W.3d 126 (Tex. 2010).

to be invalid, the invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions. *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998); *see also* TEX. GOV'T CODE ANN. § 311.032(c) (Vernon 2005).

A retroactive law is "a law that acts on things which are past." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002) (citing *DeCordova v. City of Galveston*, 4 Tex. 470, 475 (Tex. 1849)). As noted by the United States Supreme Court, the "principle that the legal effect of *conduct* should ordinarily be assessed under the law that existed *when the conduct took place* has timeless and universal human appeal." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S. Ct. 1483, 1497 (1994) (emphasis added). The Texas Supreme Court, in comparing the constitutional prohibition against retroactive laws in the civil-law context to the constitutional prohibition against ex post facto laws in the criminal-law context, has noted that "the plain and obvious meaning and intention" of prohibiting ex post fact laws is that legislatures "shall not pass laws, *after a fact done* by a subject, or a citizen, *which shall have relation to such fact*, and shall punish him for having done it." *Robinson*, 335 S.W.3d at 137 (quoting *Calder v. Bull*, 3 U.S. 386, 390, 1. L. Ed. 648 (1798)) (emphasis added). Thus, as explained by the supreme court, the prohibition against retroactive laws has "two fundamental" objectives: (1) it protects "settled expectations," which "'should not

42

be lightly disrupted,'" i.e., "the rules should not change after the game has been played," and (2) it protects against "abuses of legislative power," which "'offer[s] special opportunities for the powerful to obtain special and improper legislative benefits.'" *Id*. at 139 (quoting *Landgraf*, 511 U.S. at 265–267, 267 n.20, 114 S. Ct. at 1497–98, 1498 n.20). Given these two fundamental principles recognized by the supreme court, an unconstitutional retroactive law is, in regard to tort liability, essentially a law that either creates or relieves such liability for conduct that took place before the effective date of the law. As the Texas Constitution clearly forbids the legislature from criminalizing certain past conduct by enacting ex post facto laws, it also clearly forbids the legislature from either creating or relieving tort liability for certain past conduct by enacting retroactive laws.[28]

---

[28] Thus, whether a statutory provision is unconstitutionally retroactive, in regard to tort liability, necessarily requires a court to consider whether the provision has the effect of either establishing or eliminating such liability for conduct that occurred before the enactment of the statute. Such a statutory provision, "that acts on things which are past," certainly disrupts "settled expectations" and "changes the rules" in regard to tort liability "after the game has been played." *See Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 139–40 (Tex. 2010). It is precisely this type of retroactive law that article I, section 16 of the Texas Constitution absolutely forbids.

Texas courts have struggled with articulating a standard for determining whether a statute is unconstitutionally retroactive, focusing on whether a challenged statute "impairs vested rights." *See id*. Texas courts have traditionally held that a statute violates the Texas Constitution's prohibition against retroactive laws if, when applied, the statute "takes away or impairs vested rights acquired under existing law." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002) (citing *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex. 1981)); *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997). This test can be directly traced

In *Robinson*, Barbara Robinson and her husband, John, filed suit against Crown Cork & Seal ("Crown"), alleging that John had contracted mesothelioma from workplace exposure to asbestos products, including products that were manufactured by a corporation with which Crown had merged. *Id*. at 129. The Robinsons further alleged that Crown had succeeded to this merged corporation's liabilities. *Id*. During the pendency of the Robinsons' suit, the Texas Legislature enacted Chapter 149 of the Texas Civil Practice and Remedies Code, "which limit[ed] certain corporations' successor liability for asbestos claims." *Id*. at 130 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 149.001–.006 (Vernon 2011)). Crown subsequently sought summary judgment, arguing that Chapter 149 barred the Robinsons' claims. *Id*. at 132–33. In response, the Robinsons argued that the record did not support the application of Chapter 149 or, alternatively, Chapter 149 violated article I, section 16 of the Texas Constitution. *Id*. at 133. After the trial

_____

to Justice Story's famous statement:

> [E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective . . . .

*Soc'y for the Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (No. 13,156) (quoted in *Robinson*, 335 S.W.3d at 140). However, applying such a broad standard, which, it seems, was intended to cover most, if not all, civil-law matters, has proven to be highly problematic. *See Robinson*, 335 S.W.3d at 139–47. As noted by the Texas Supreme Court, "What constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity." *Id.* at 143.

court granted Crown's summary-judgment motion, John Robinson died. *Id.*

On appeal, Barbara Robinson asserted that Chapter 149 was a retroactive law, prohibited by article I, section 16 of the Texas Constitution, and the legislature had no authority to extinguish her accrued cause of action against Crown. *Id.* The supreme court, after providing extensive analysis of Texas' vested-rights jurisprudence, explained,

> We think our cases establish that the constitutional prohibition against retroactive laws does not insulate every vested right from impairment, nor does it give way to every reasonable exercise of the Legislature's police power; ***it protects settled expectations that rules are to govern the play and not simply the score, and prevents the abuses of legislative power that arise when individuals or groups are singled out for special reward or punishment***.

*Id.* at 145 (emphasis added). It then articulated a new test for determining whether a statute violates the prohibition against retroactive laws in article I, section 16 of the Texas Constitution, stating,

> [C]ourts must consider three factors in light of the prohibition's dual objectives: the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the statute; and the extent of the impairment.

*Id.* The court emphasized,

> The perceived public advantage of a retroactive law is not simply to be balanced against its relatively small impact on private interests, or the prohibition would be deprived of most of its force. There must be a compelling public interest to overcome the heavy presumption against retroactive laws. To be sure, courts must be mindful that statutes are not to be set aside lightly. This Court has invalidated

statutes as prohibitively retroactive in only three cases, all involving extensions of statutes of limitations. But ***courts must also be careful to enforce the constitutional prohibition to safeguard its objectives***.

*Id*. at 145–46 (citations omitted) (emphasis added). It noted that "changes in the law that merely affect remedies or procedure, or that otherwise have little impact on prior rights, are usually not unconstitutionally retroactive." *Id*. at 146.

In considering the nature of the Robinsons' rights and Chapter 149's impact on those rights, the supreme court recognized that Chapter 149 did not "directly restrict the Robinsons' common law action for personal injuries due to exposure to asbestos in the workplace" but rather "supplant[ed] the usual choice-of-law rules" by mandating that Texas courts apply the Texas law limiting successor liability "even if . . . successor liability arose under the law of another state." *Id*. at 147. However, the court noted that Chapter 149 extinguished the Robinsons' claims and all other such claims against Crown in Texas and "extinction was the Legislature's specific intent." *Id*. at 148. It also noted that "[a]n interest in maintaining an established common-law cause of action is greater than an interest in choice-of-law rules." *Id*. The court further noted that although "[a]n unliquidated claim may have little or no value, as for example when the cause of action has not been recognized or the elements of recovery cannot be proved," the Robinsons' claims constituted "a mature tort," and the court characterized the Robinsons' recovery as "more predictable." *Id*. The court emphasized that the injury at issue was

"mesothelioma," and that such an injury was a "uniquely asbestos-related disease." *Id*. It also considered the discovery on file that reflected that the "claims had a substantial basis in fact." *Id*. Because the "the Robinsons could well have expected . . . that a rule of law that permitted their recovery . . . would not be changed after they had filed suit to abrogate their claim," and because Chapter 149 disturbed "settled expectations," the court concluded that Chapter 149 "significantly impact[ed] a substantial interest the Robinsons [had] in a well-recognized common-law cause of action." *Id*. at 148–49.

Next, in considering the public interest served by Chapter 149, the supreme court stated that the "legislative record [was] fairly clear that Chapter 149 was enacted to help only Crown and no one else," but yet "the record" supporting the legislation "was silent concerning the number" of asbestos-related claims pending against Crown "or the amount of Crown's probable exposure." *Id*. at 149. The court rejected Crown's argument that Chapter 149 helped "alleviate the asbestos litigation crisis that has already bankrupted many companies, resulting in lost jobs and a burden on the State's economy" because "[t]he Legislature made no findings to justify Chapter 149." *Id*. It stated that, contrary to Crown's argument, the legislature had not acknowledged the asbestos litigation crisis in enacting Chapter 149. *Id*. In contrast, the court noted that the legislature had expressly recognized the asbestos litigation crisis in enacting Chapter 90, the provision at issue here. *Id*.

47

at 149, n.130. And it pointed out that even the principal sponsor of Chapter 149 had "fail[ed] to show how the legislation serve[d] a substantial public interest," and the record was unclear as to how the public interest benefitted as a result of Chapter 149. *Id*. at 149. Thus, the court concluded that the "public interest served by Chapter 149 [was] slight." *Id*. at 150.

Having concluded that Chapter 149 significantly impacted the Robinsons' substantial interest in a well-recognized common-law cause of action and the public interest served by Chapter 149 was slight, the supreme court held that Chapter 149, as applied to the Robinsons' common-law claims, violated article I, section 16 of the Texas Constitution. *Id*.

In the instant case, an application of the Texas Supreme Court's newly articulated test for determining whether a statute is unconstitutionally retroactive compels our conclusion that section 90.010(f)(1)(B)(ii)'s requirement of a verification that Joseph had had pulmonary function testing performed on him in order for the Emmites to assert their asbestos-related injury claims is unconstitutional as applied to them. We conduct our analysis in light of the "two fundamental" objectives of our constitution's prohibition against retroactive laws: (1) the protection of "settled expectations," which "'should not be lightly disrupted,'" i.e., "the rules should not change after the game has been played," and (2) the protection against "abuses of legislative power," which "'offer[s] special

48

opportunities for the powerful to obtain special and improper legislative benefits.'"

*Id.* at 139 (quoting *Landgraf*, 511 U.S. at 265–67, 267 n.20, 114 S. Ct. at 1497–98, 1498 n.20).  Mindful of these objectives, we consider (1) the nature and strength of the public interest served by section 90.010(f)(1)(B)(ii) as evidenced by the legislature's factual findings; (2) the nature of the Emmites' prior rights impaired by section 90.010(f)(1)(B)(ii); and (3) the extent of the impairment of those rights. *Id*. at  145.

## A.    *The Nature of the Rights Claimed by the Emmites and Section 90.010(f)(1)(B)(ii)'s Impact on Those Rights*

As did the Texas Supreme Court in *Robinson*, we first consider together the nature of the rights claimed by the Emmites and section 90.010(f)(1)(B)(ii)'s impact on them.  *See id*. at 147–48.  With the passage of Chapter 90, the Texas Legislature imposed physician reporting requirements on all asbestos-related injury claims filed on or after its effective date as well as on all such claims pending on the effective date and in which a trial, or any new trial or retrial following motion, appeal, or otherwise, commenced 90 days after Chapter 90's effective date.  TEX. CIV. PRAC. & REM. CODE ANN. § 90.006(a), (c).  Chapter 90 became effective on September 1, 2005, after Joseph's death but well over one year before the Emmites had filed suit.  Thus, as noted above, the Emmites, in order to assert and maintain their claims, were required to serve a physician report in compliance with section

90.010(f)(1)(B)(ii).[29]  TEX. CIV. PRAC. & REM. CODE ANN. § 90.010(e).

Union Carbide does not dispute the fact that during the last months of his life, pulmonary function testing could not be performed on Joseph and he died before Chapter 90 became effective.  Specifically, Union Carbide, in its briefing, "does not dispute that [Joseph] had a diagnosis of asbestosis; . . . and that, given his advanced dementia" and other conditions "pulmonary function testing during [Joseph's] last few months of life was likely unobtainable."  Moreover, it is undisputed that at the time Joseph died, a physician report containing a pulmonary function test was not required to bring asbestos-related injury claims like those asserted by the Emmites.

Because a pulmonary function test could not be performed on Joseph, section 90.010(f)(1)(B)(ii)'s requirement of a verification that Joseph had pulmonary function testing performed on him, like Chapter 149 in *Robinson*,

---

[29]  The Texas Legislature excepted from the physician reporting requirements any asbestos-related injury claims in any pending actions in which the trial had commenced on or before 90 days after Chapter 90's effective date.  TEX. CIV. PRAC. & REM. CODE ANN. § 90.006(b).  Section 90.006 prescribed different deadlines for filing the required physician report depending on whether the action was filed on or after, or was pending on, the effective date of Chapter 90.  *See id*. § 90.006.  Here, the Emmites' cause of action accrued before the effective date of Chapter 90, but because the Emmites did not file their cause of action until 2007, it was not pending on the effective date of Chapter 90.  Nevertheless, section 90.006 makes clear that, even if the Emmites had filed their claim immediately after Joseph's death in June 2005, but before the effective date of Chapter 90 in September 2005, the Emmites would still likely have been required to file a complying physician report under Chapter 90.  *See id*.

would have the effect of extinguishing the Emmites' claims. *See Robinson*, 335 S.W.3d at 148. Also, like the Robinsons' claims, the Emmites' claims, although unliquidated, had become a mature tort, and their recovery was, as concluded by the MDL pretrial court, more predictable. *See id.* And, as in *Robinson*, the evidence on file reveals that the Emmites' claims have a substantial basis in fact.[30] *See id.* Indeed, the MDL pretrial court specifically found:

2. The autopsy findings revealed asbestosis that had resulted in severe pulmonary fibrosis and the cause of [Joseph's] death was the combined effects of retained asbestos fibers; . . . .

5. Had Joseph Emmite been physically and mentally capable of performing a pulmonary function test, the results would have demonstrated pulmonary impairment greater than required under Texas Civil Practice and Remedies Code § 90.003; . . . .

10. Dr. Prince had no history of working as a litigation consultant. The testimony and opinions offered by Dr. Prince were at all times credible, reliable and uncontroverted; . . . [and]

12. Mr. Emmite's family produced sufficient credible evidence to allow a finder of fact to reasonably find that Mr. Emmite's asbestos impairment is comparable to the impairment that an exposed person would have had if the exposed person met the criteria set forth in Section 90.003[.]

Moreover, in his second report, Dr. Prince specifically noted:

In summary, premorbid diagnostic workup was compatible with benign asbestos pleural effusion. The findings of an exudative pleural effusion, coupled with the presence of the diagnostic imaging

---

[30] Union Carbide asserts that the Emmites' "reliance on [Joseph's] death as conclusive proof of his impairment is misplaced." It also asserts that Joseph's autopsy and amended death certificate do not establish his impairment.

revealing pleural plaques and bilateral, predominantly basilar, pulmonary fibrosis *support my clinical diagnosis of pulmonary asbestosis with significant impairment.*

(Emphasis added.)   In regard to pulmonary function testing, Prince emphasized:

> As noted above, pulmonary function testing would be clinically ideal to secure the diagnosis of pulmonary asbestosis. *It is my opinion that had the patient been able to successfully undergo pulmonary function testing, restriction and diffusion abnormalities would have been identified, consistent with his clinical diagnosis of pulmonary asbestosis. However, in [Joseph's] case, the clinical history and other diagnostic testing, coupled with meticulous postmortem analysis of pulmonary tissue, confirms my opinion that [Joseph] had significant, advanced pulmonary asbestosis.* In making my diagnosis I have considered Mr. Emmite's other medical conditions—including immobility and pneumonia—and it is my opinion that he had a pulmonary impairment from his asbestosis that was not more probably the result of other causes.

(Emphasis added.)   Thus, according to Dr. Prince, given the strength of the Emmites' case, although pulmonary function testing would have been "ideal," it would have, based on the strength of "meticulous postmortem analysis" and other diagnostic testing, merely served to confirm the obvious.

As noted above, Union Carbide argues that the Emmites' constitutional challenge is even weaker because their cause of action is based on a statute—the Texas Wrongful Death Act, and "the settled expectations in a statutory cause of action differ from those in a common-law claim." *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.002, 71.021; *see also Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 903 (Tex. 2000) (recognizing that wrongful death and survival

claims are statutory).  In support of its argument, Union Carbide cites *Quick v. City*

*of Austin*, in which the Texas Supreme Court explained,

> The general rule is that when a statute is repealed without a savings clause limiting the effect of the repeal, the repeal of that statute is usually given immediate effect.  When a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment.  Ordinarily, all suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal. *The repeal of the statute in such instances deprives a court of subject matter jurisdiction over the cause*.

7 S.W.3d 109, 128 (Tex. 1998) (citations omitted) (emphasis added).  Similarly, in

*Dickson v. Navarro County Levee Improvement Dist. No. 3*, the court stated,

> It is almost universally recognized that if a statute giving a special remedy is repealed, without a saving clause in favor of pending suits, all suits must stop where the repeal finds them; and, if final relief has not been granted before the repeal goes into effect, it cannot be granted thereafter.  A like general rule is that if a right to recover depends entirely upon a statute, *its repeal deprives the court of jurisdiction over the subject matter.*

135 Tex. 95, 99, 139 S.W.2d 257, 259 (1940) (emphasis added).  Based upon this

language, Union Carbide reasons that, if the legislature could have repealed the

entire Wrongful Death Act and deprived the Emmites of any recovery, the "less

sweeping modification of [the Emmites'] rights" under Chapter 90 would

"necessarily" not deprive them of a vested right.

In *Robinson*, the Texas Supreme Court recognized that "an analysis of the

retroactive effect" of a statute "on common law claims and statutory claims presents different considerations." *See Robinson*, 335 S.W.3d at 136. But, the court did not address this issue, stating, "We intimate no view on whether Chapter 149 limits Robinson's statutory wrongful death and survival claims except insofar as they are derivative of the claims specifically adjudicated by the trial court." [31] *Id*. at 136.

Unlike in *Quick* and *Dickson*, here, the legislature has not "unqualified[ly] repeal[ed]" the statutory basis for the Emmites' claims, and there is no suggestion that the MDL pretrial court was deprived of jurisdiction over their claims. Thus, the legal principles set forth in these opinions do not dictate a rejection of the Emmites' claims. Moreover, in regard to Union Carbide's assertions that Chapter 90 does not include a savings clause, we note that the Texas Government Code supplies a general savings clause. *See* TEX. GOV'T CODE ANN. § 311.031 (Vernon 2005); *see also Quick*, 7 S.W.3d at 129–30 (stating that legislature's adoption of general savings clause indicates general legislative policy that "repeal of any statute shall not affect the prior operation of that statute nor extinguish any liability

---

[31] In its rehearing motion, Union Carbide asserts that the supreme court, in *Robinson*, "*explicitly* recognized that the settled expectations in a statutory cause of action differ from those in a common-law claim." (Emphasis added.) Actually, although the supreme court acknowledged that the analysis involves different considerations, the supreme court *explicitly* "intimate[d] no view" on the matter. *See Robinson*, 335 S.W.3d at 136. And, contrary to Union Carbide's arguments on rehearing, the *Robinson* opinion does not compel the failure of the Emmites' constitutional challenge because their claims are based on statute rather than common law.

incurred or affect any right accrued or claim arising before" repeal takes effect and that court will presume that general savings clause applies "unless a contrary legislative intent is shown by clear expression or necessary implication"). Thus, Union Carbide has not demonstrated that the Emmites are foreclosed from asserting their asbestos-related injury claims because their causes of action are based in statute rather than common law.

The bottom line is that the pulmonary function testing requirement of section 90.010(f)(1)(B)(ii) under the unique circumstances presented in this case would in fact extinguish the asbestos-related injury claims of the Emmites.[32] It would have a grave impact on the Emmites' well-established right to pursue their claims, which, like the Robinsons' claims, have a substantial basis in fact. *See Robinson*, 335 S.W.3d at 147–49. Thus, if applied here, section 90.010(f)(1)(B)(ii) would change the rules "after the game has been played" and "disturb settled expectations." *See id.*

**B.** *The Nature and Strength of the Public Interest Served by Section 90.010(f)(1)(B)(ii)*

We next consider, as did the supreme court in *Robinson*, the nature and the

---

[32] Normally, a dismissal for failure to timely serve a physician report, or one that complies with the requirements of section 90.003, would be "without prejudice to the claimant's right, if any, to assert claims for an asbestos-related injury . . . in a subsequent action." TEX. CIV. PRAC. & REM. CODE ANN. § 90.007. Here, however, given Joseph's death, a pulmonary function test cannot be performed on him; thus, the Emmites' claims would be extinguished.

55

strength of the public interest served by section 90.010(f)(1)(B)(ii). *See id.* at 149.

The Texas Legislature enacted Chapter 90 specifically in response to an "asbestos litigation crisis," which it found to be "costly to employers, employees, litigants, and the court system." TEX. CIV. PRAC. & REM. CODE ANN. § 90.001 cmts. d, f, g. In doing so, the legislature cited the facts that "hundreds of thousands of lawsuits alleging asbestos-related disease have been filed throughout the United States," "[i]n the period from 1988 to 2000, more lawsuits alleging asbestos-related disease were filed in Texas than in any other state," and "between 60,000 and 128,000 American workers" had "lost their jobs as a result of asbestos-related bankruptcies." *Id.* § 90.001 cmts. c, e, g.

However, the legislature emphasized that it was enacting Chapter 90 not only to protect companies that are commonly sued for asbestos-related injuries and their employees, but also for the express purpose of protecting "the right of people with impairing asbestos-related . . . injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system, while at the same time preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to asbestos . . . *but have no functional or physical impairment from asbestos-related . . . disease*." *Id.* § 90.001 cmt. n (emphasis added). The legislature specifically found that persons who were not "functionally or physically impaired by any asbestos-related illness" and who

had brought asbestos-related lawsuits had "severely hamper[ed] the ability of seriously ill claimants to seek redress in the courts." *Id*. § 90.001 cmt. h. It explained that "[t]hose claimants who have had their day in court often find that the value of their recovery is seriously reduced when the company against whom the judgment was rendered files bankruptcy due to the weight of asbestos litigation brought by unimpaired claimants." *Id*.

Thus, in contrast to Chapter 149, the Texas Legislature made clear its legitimate intent in enacting Chapter 90 through extensive findings. Significantly, the supreme court in *Robinson* acknowledged the legislative findings made in support of Chapter 90 in contrasting it with Chapter 149. *See Robinson*, 335 S.W.3d at 149. It is quite clear that Chapter 90, in its entirety, serves a substantial public interest in protecting not only employers and employees, but also legitimate asbestos-related injury claimants.

Our analysis, however, does not end here. We have to look at the nature and the strength of the public interest served by section 90.010(f)(1)(B)(ii), the provision specifically challenged by the Emmites, in the context of their claims. Generally, the pulmonary function testing requirement of section 90.003(a)(2)(D) probably well fulfills the legitimate legislative purpose of "preventing scarce judicial and litigant resources from being misdirected" by those who have been exposed to asbestos but "have no functional or physical impairment" from

asbestos-related disease. TEX. CIV. PRAC. & REM. CODE ANN. § 90.001 cmt. n. However, section 90.010(f)((1)(B)(ii), unlike section 90.003(a)(2)(D), does not require that pulmonary function testing show any specific minimal impairment.

Given the circumstances presented in this case, requiring a pulmonary function test under section 90.010(f)(1)(B)(ii) would have the opposite effect of what the legislature actually intended, i.e., the protection of "the right of people with impairing asbestos-related" injuries "to pursue their claims for compensation in a fair and efficient manner." *Id*. § 90.001 cmt. n. As noted above, although pulmonary function testing of Joseph would have been "ideal," here, according to Dr. Prince, whom the MDL pretrial court found credible, such testing was not necessary to establish Joseph's asbestos-related impairment. As emphasized by Dr. Prince, had Joseph "been able to successfully undergo pulmonary function testing, restriction and diffusion abnormalities would have been identified, consistent with his clinical diagnosis of pulmonary asbestosis.[33] However, in [Joseph's] case, the clinical history and other diagnostic testing, coupled with

---

[33] Union Carbide, in its rehearing motion, asserts that Joseph "reasonably would have expected to have been given [a pulmonary function test] had his doctors believed he was impaired by his asbestosis," pulmonary function testing "is nothing new," and "[e]ven before Chapter 90's enactment, anyone suffering from asbestos-related pulmonary impairment would have undergone such testing." Union Carbide further asserts that Joseph, "within the contemplation of Chapter 90, was one of the unimpaired." Union Carbide's factual assertions, which are not established by the record, are contradicted by Dr. Prince's findings and ignore his opinion that Joseph, at the time he suffered impairment from asbestosis, could not have performed a pulmonary function test.

meticulous postmortem analysis of pulmonary tissue, confirms my opinion that [Joseph] had significant, advanced pulmonary asbestosis."

Thus, here, there is no compelling reason for the retroactive application of section 90.010(f)(1)(B)(ii) and no public interest is served by its application to the asbestos-related injury claims of the Emmites. Indeed, its application would only serve to shield Union Carbide from tort liability to claimants whom Chapter 90 was enacted, in large part, to protect. It would effectively give Union Carbide a "special opportunit[y] . . . to obtain [a] special and improper legislative benefit[]."[34] *See Robinson*, 335 S.W.3d at 139.

Joseph died before Chapter 90 became effective, and it is undisputed that at the time he died, a physician report was not required to bring asbestos-related injury claims. Significantly, it is also undisputed that, during the last months of his life, Joseph could not undergo pulmonary function testing for medical reasons. Based upon the unique circumstances presented in this case, we conclude that the application of section 90.010(f)(1)(B)(ii) to preclude the Emmites' from pursuing their claims would act on "things which are past," disrupt "settled expectations," and "change the rules" in regard to tort liability "after the game has been played."

---

[34] Again, as noted above, normally, a dismissal for failure to timely serve a physician report, or one that complies with the requirements of section 90.003, would be "without prejudice to the claimant's right, if any, to assert claims for an asbestos-related injury . . . in a subsequent action." TEX. CIV. PRAC. & REM. CODE ANN. § 90.007. Here, however, given Joseph's death, because a pulmonary function test cannot be performed on him, the Emmites' claims would be extinguished.

*See id.* at 139. Thus, section 90.010(f)(1)(B)(ii), as applied to the Emmites' asbestos-related injury claims, violates article I, section 16 of the Texas Constitution. *See Robinson*, 335 S.W.3d at 150. Accordingly, we conclude that the MDL pretrial court did not err in denying Union Carbide's motion and renewed motion to dismiss the asbestos-related injury claims of the Emmites.

## VI. Conclusion

We affirm the order of the MDL pretrial court denying Union Carbide's motion and renewed motion to dismiss the asbestos-related injury claims of the Emmites.

Terry Jennings
Justice

Panel consists of Justices Jennings and Sharp.

A majority of the justices of the Court voted in favor of reconsidering the case en banc. TEX. R. APP. P. 49.7.

The en banc court on reconsideration consists of Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Sharp, and Brown.

Justice Jennings, writing for the En Banc Court, joined by Justices Higley and Sharp.

Justice Keyes joins parts I, II, III, and IV of the En Banc Opinion.

Justice Bland, concurring in the judgment, joined by Chief Justice Radack and Justice Brown.

Justice Keyes, dissenting from the judgment.

Justices Massengale and Huddle not sitting.